|  |  |
|---|---|
| Pamela Jeanette Smith | Continuous Employment Retaliation |
| -against - | Case No. _____ |
| The Curators of the University of Missouri | Request Trial by Jury |

## PLAINTIFF'S ORIGINAL COMPLAINT

COME NOW The Plaintiff, Pamela Jeanette Smith, proceeding pro se, to file this Original Complaint.

### I.   REQUEST FOR TRIAL BY JURY

The Plaintiff, Pamela Jeanette Smith, proceeding pro se, requests trial by jury.

### II.   PARTIES TO THE COMPLAINT

1. As the Plaintiff, I am a person with a disability, a citizen of the United States of America, and a citizen of Columbia, Boone County, Missouri, and have been so continuously since July 2001. I reside at 6620 S. Maple Meadows Drive, Columbia, Boone County, Missouri, 65203. My phone number is 573/875-4076 and my email address is Pamela_J_Smith@yahoo.com
2. At all times relevant to this lawsuit, until my termination in November, 2016, I was employed as tenured Associate Professor of Law, assigned to the University of Missouri-Columbia School of Law, Hulston Hall, Columbia, Boone County, Missouri, 65211. The main phone line is 573/882-4755. My email address was smithpj@missouri.edu. After the University terminated me on November 4, 2016, and listed me as an employee retiree the next day, but blocked my retirement for eighteen (18) months rather than distributing it, I was no longer employed.
3. Defendant, the Curators of the University of Missouri resided at 316 University Hall, Columbia, Boone County, Missouri, 65211 (hereinafter referred to as Defendant, University, or Institutional Defendant). Its phone number is 573/882-2388 and its email address is boardofcurators@umsystem.edu. The Curators of the University of Missouri has its primary place of business as a higher educational institution in Columbia, Boone County, Missouri.

## III. JURISDICTION

4. I am pursuing employment disability retaliation against the University and the individual defendants as violations of
   a. Americans with Disabilities Act of 1990, as amended, 42 U.S.C. Sec. 12101, *et seq.* (hereinafter the ADA or ADAAA).
   b. Rehabilitation Act of 1973, as amended, 29 U.S.C. Sec. 701, *et seq.* (hereinafter RAAA).
   c. The Missouri Human Rights Act (MHRA), Mo. Rev. Stat. Sec. 213.010, *et seq.*,
5. Defendant is subjected to the ADAAA and MHRA as an employer of more than 150 employees, employing thousands of employees around the State of Missouri.
6. The University is a federal contractor. On its website, which is publicly available information, the University admits it is "a major federal contractor" and receives federal funds. *See, University of Missouri. MU ADA Accessibility and Education.* Last updated June 20, 2016. Viewed on April 13, 2017 at http://ada.missouri.edu/rights-responsibilities.php.
7. The University has waived its sovereign immunity and can be sued under the RAAA by accepting federal funds and being a federal contractor. Under the RAAA sovereign immunity is waived if The University receives federal funds, in accordance with 29 U.S.C. § 794(a).
8. Sovereign immunity is also waived for state contract claims since the University has contract claims against it that can be paid out of non-state funds. In publicly available information, the University noted that only 35% of its expected funding for operations come from state appropriations, down from approximately 60% in 2001 and declining. *University of Missouri System, Fiscal Year Budget 2017, The University of Missouri System Operating Budget Book*, obtained on April 13, 2017 from https://www.umsystem.edu/media/fa/budget/FY2017BudgetBook.pdf
9. Plaintiff is also suing the University and individual employees in their individual capacities for multiple violations of the Fifth and Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983.
10. Given the above, this Court, therefore, has federal question jurisdiction. This court has supplemental jurisdiction for any state claims as they arise out of the same facts, pursuant to 28 U.S.C § 1367.

## IV. VENUE

11. I am a resident of Columbia, Boone County, Missouri, and have been so continuously since July 2001. I have resided at my current address since July 2011. All currently known facts of this lawsuit occurred in the city of Columbia, Boone County, Missouri. The University had its primary place of business as a higher educational institution in Columbia, Boone County, Missouri, at the time the facts of this lawsuit occurred, and remains so. Venue, therefore, is proper in this Court in Jefferson City, Missouri, for the Western District of Missouri.

## V. ADMINISTRATIVE PROCEDURES

12. I have satisfied all procedural requirements prior to commencing this action.
13. I am a person with an actual disability, Chronic Fatigue Immune Dysfunction Syndrome, and have a record of impairment giving rise to disability since December 2005.
14. On July 23, 2018, I filed a charge of continuing retaliation with the Equal Employment Opportunity Commission (EEOC), which was also dually filed with the Missouri Commission on Human Rights (MCHR), as # 560-2018-02274. This was my sixth (6th) charge for continuous discrimination and/or retaliation against the University.
15. On December 12, 2018, I received, the EEOC's notice of right to sue letter. I have not received the right to sue letter from the MCHR, but requested it.
16. This lawsuit was filed within ninety (90) days of my receipt of the EEOC's right to sue notice. Further, the Defendant's actions fall within the Plaintiff's claims of continuous discrimination and retaliation, continuing and escalating since 2006.

## VI. INTRODUCTION: STATEMENT OF CLAIM

17. The retaliatory conduct I complain in this action includes:
    - ☑ Retaliation.
    - ☑ Other: Retaliatory action as conspiracy to breach contract for tenured employment and vested property interests; Violation of State and federal due process rights (substantive and procedural); Breach of State contract law and breach of the implied duty of good faith and fair dealing.
18. It is my best recollection that the alleged retaliatory acts began in 2006 and were continuous with the most recent action being June 2018.
19. The University and its employees are still committing these acts against me.
20. The University and its employees are continuing to retaliate against me based on:
    - ☑ Disability, Chronic Fatigue Immune Dysfunction Syndrome.
    - ☑ Retaliation
21. Plaintiff, Pamela Jeanette Smith, proceeding pro se, brings this action pursuant to federal and state law. This is an action for and retaliation in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. Sec. 12101, *et seq. and* the Rehabilitation Act of 1973, as amended, 29 U.S.C. Sec. 701, *et seq.,* the U.S. Constitution Fifth and Fourteenth Amendment (substantive and procedural due process and violation of liberty interests), Missouri State Constitution (substantive and procedural due process rights and liberty interests), Missouri State contract law.
22. All statutory, constitutional and/or legal actions arise from the defendants continuous retaliatory actions since 2007, if not before, and continuing June 2018 and thereafter, including but not limited to wrongful termination, without due process, conspiracy to breach my employment contract for tenure, conspiracy to breach contract by alleging abandonment of tenure, use of spoliation to circumvent due process, use of spoliation to block distribution of retirement, constructive discharge for failing to provide accommodations, conspiracy to withhold

distribution of vested retirement property, blocking vested retirement property for eighteen (18) months, failing to act in good faith thereby breaching the contract and violating contractual and constitutional duties to provide due process.

23. Plaintiff is suffering continuous and ongoing retaliation from the Defendant.

## VII. FACTS

24. As the Plaintiff, I had a contract for tenured employment as of March 2000.
25. Plaintiff was employed by the University as a tenured Associate Professor of Law, in 2001 at its law school in Columbia, Missouri.
26. Plaintiff's employment with the University began in or around July of 2001.
27. Plaintiff was employed with tenure and its protections as an inseparable part of the terms of the employment contract with the University.
28. Plaintiff's offer and acceptance is an employment contract for tenured employment.
29. Plaintiff's tenured employment was subjected to the contractual obligations for faculty and the University as articulated in the University of Missouri's Collected Rules and Regulations (hereinafter CRRs), including but not limited to:
    a. University of Missouri Retirement, Disability and Death Benefit Plan at https://www.umsystem.edu/totalrewards/retirement
    b. University of Missouri CRRs at https://www.umsystem.edu/ums/rules/collected_rules/fullindex
    c. CRRs for the Columbia campus at https://www.umsystem.edu/ums/rules/collected_rules/faculty/ch300/300.010_faculty_bylaws_umc
    d.
    e. CRR For Academic Freedom and Economic Security via Tenure at https://www.umsystem.edu/ums/rules/collected_rules/faculty/ch310/310.010_academic_freedom_and_economic_security_of_academic_staff
    f. For No Impairment for Rights of Tenure at https://www.umsystem.edu/ums/rules/collected_rules/faculty/ch310/310.040_no_impairment_of_rights_of_tenure
    g. For Reasons for and Procedure for Dismissal at https://www.umsystem.edu/ums/rules/collected_rules/faculty/ch310/310.060_procedures_in_case_of_dismissal_for_cause
    h. For Employment and Termination at https://www.umsystem.edu/ums/rules/collected_rules/personnel/ch320
    i. CRR for Equal Employment and Educational Opportunity at https://www.umsystem.edu/ums/rules/collected_rules/equal_employment_educational_opportunity/ch600/600.010_equal_employment_educational_opportunity_policy
    j. CRR for Anti-Retaliation, https://www.umsystem.edu/ums/rules/collected_rules/equal_employment_educational_opportunity/ch600/600.010_equal_employment_educational_opportunity_policy.
    k. CRR for Policies Related to Employees with Disabilities at https://www.umsystem.edu/ums/rules/collected_rules/equal_employment_

educational_opportunity/ch600/600.080_policy_related_to_employees_with_disabilities

30. CRR 310.010B defines tenure as "the right to be free from dismissal without cause. Tenure is indispensable to the success of an institution of higher education in fulfilling its obligations to the common good." https://www.umsystem.edu/ums/rules/collected_rules/faculty/ch310/310.010_academic_freedom_and_economic_security_of_academic_staff.

31. CRR 310.060 states, "In cases of dismissal of faculty for cause, the burden of demonstrating the existence of an adequate case for dismissal shall rest with the University." CRR 310.060 sets for the detailed procedure for a faculty member to be dismissed, including due process details like notice, a hearing, and appeal.

32. Despite being dismissed, Plaintiff has never been provided cause and the University has never shown cause against Plaintiff.

33. The University has terminated me without ever meeting its burden to show cause.

34. There is also a CRR setting for prohibitions against discriminating against people with disabilities, stating "Disability discrimination includes not making reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, barring undue hardship." CRR 600.080.

35. The University has engaged in multiple acts of disability discrimination against me as a person with a disability because despite my repeated requests for disability accommodations since February 2006 the University has never provided me accommodations to work, creating constructive discharge.

36. There is also a prohibition against retaliation in the CRRs: "Retaliation. Retaliation is any adverse action taken against a person because of that person's participation in protected activity. The University strictly prohibits retaliation against any person for making any good faith report of discrimination, harassment, or sexual misconduct, or for filing, testifying, assisting, or participating in any investigation or proceeding involving allegations of discrimination, harassment or sexual misconduct. Any person who engages in such retaliation shall be subject to disciplinary action, up to and including expulsion or termination, in accordance with applicable procedures . . ." CRR 600.010.

37. I have been retaliated against continuously since I complained about a racial retention policy and sought disability accommodations. In fact, I have now filed six (6) charges of discrimination with the MCHR/EEOC and retaliation against the University, as well as three (3) lawsuits. Each is incorporated herein.

38. I filed a charge of discrimination against the University and its dean of the law school, R. Lawrence Dessem, for hostile workplace environment (HWPE), among other causes of action. I filed suit in Boone County State Court in 2007, 07BA-CV02487 *(hereinafter Lawsuit 1),* alleging that Defendant Dessem threatened to terminate my tenure. I noted that Dessem was extending his HWPE actions by retaliating and failing to provide me disability accommodations or an interactive process.

39. I became disabled and was diagnosed in December 2005 with Chronic Fatigue Immune Dysfunction Syndrome, described fully in Plaintiff's Second Amended Complaint in Lawsuit 3, Docket Case No. 2:17-cv-c-4016-WJE *(Lawsuit 3).*

40. I sought accommodations for this disability to work as of February 2006. Dessem continued his retaliation and discrimination against me as a person with a disability and retaliated against me by refusing to comply with the Americans with Disabilities Act from February 2006 until September 2007, refusing to do the basics of assessing disability, with he and the University claiming it was doing a "non-assessment of disability," which violated the ADA.
41. I sought assistance from the then ADA Coordinator, Lee Henson, in June 2006, but after meeting alone with Dessem and his assistant dean, Mr. Henson was silenced and neutered and unable to do his as ADA Coordinator.
42. I filed a charge of discrimination against the University and all individuals involved in failing to provide me an interactive process to obtain disability accommodations to work from February 2006 until the start of the Fall 2007 semester in September 2007. I filed suit in May 2008 in Boone County State Court, Docket 08BA-CV02268 *(hereinafter Lawsuit 2)*, alleging that Defendant Dessem and the others were engaging in constructive discharge, violation of due process, failing to provide disability accommodations, and escalating hostile workplace environment.
43. From February 2006 until September 2007, I sought assistance from every level of leadership from the University, as Lawsuits 1 and 2 show, to no avail, and Defendant Dessem was given free reign to engage in disability retaliation.
44. The discrimination and retaliation continued and continues. It has been ongoing.
45. Once the Fall 2007 semester began, Mr. Henson intervened, finally doing his job and provided me with a disability leave as an accommodation because Dessem was attempting to force me to constructively discharge because he failed to provide accommodations to work or to force me to take long-term disability.
46. When I sought to return to work in 2015 the retaliation escalated as the University failed to provide me an interactive process to return to work and then terminated me after initially claiming I was not its employee.
47. As part of Lawsuit 3, I filed a separate retaliation complaint after the University terminated me, with a right to sue letter received from the MCHR around March 25, 2017 and a right to sue letter received from the EEOC, via the Department of Justice, around May 9, 2017, and the original Lawsuit 3 was amended solely to add the right to sue letters. Docket Case No. 2:17-cv-c-4016-WJE.
48. As to Mr. Henson and his disability leave as an accommodation, I began that leave in January 2008 and did not hear anything from Mr. Henson or the University claiming it was not legitimate and in fact the University admitted I was on an approved leave of absence.
49. *Yet, as part of its litigation strategy and conspiracy to breach my tenured employment, in 2019, the University now claims that twelve (12) years ago Mr. Henson lacked authority to provide such a disability accommodation. **Lawsuit 3, Defendant's Motion for Summary Judgment (affidavits in support).***
50. To support its claim it provided affidavits of individuals, namely R. Lawrence Dessem, Kenneth Dean, Brian Foster, and Brady Deaton. Each affiant claimed that they would not have provided me the type of leave I had already taken, showing a discriminatory mindset, as my accommodation complied with the ADA.
51. Prior to my beginning my disability leave as an accommodation in January 2008, Defendant Dessem regularly sent email correspondence regarding my disability to

Mr. Henson as a cc. Discovery in Lawsuit 3 shows that once the disability accommodation was put in place, Dessem stopped sending any emails to Mr. Henson regarding my disability

52. Once I began my leave, discovery shows that as of February 2008, Dessem began to make demands that were unlawful and in violation of the ADAAA, RAAA, and MHRA, e.g., demanding I provide additional medical documentations after he and the University had received 5-7 letters, as well as forms, from my treating specialist, demanding that the physician ascertain whether my teaching twice a week was "medically superior" over something else, failed to provide his own accommodations recommendations, and failed to provide an interactive process to assess disability.
53. Dessem knew that I had vision issues as part of my disability. He also knew I did not answer emails regularly and while on leave did not expect to do so.
54. I did not expect nor receive any emails from Dessem and discovery does not show any were actually sent.
55. In discovery in Lawsuit 3, Dessem however claimed that he sent throughout 2008 and perhaps 2009 emails that I ignored.
56. His assumptions, grounded in his discriminatory and retaliatory actions were used by the University, in conspiracy to
    a. suspend my pay while I was on an unpaid leave,
    b. allege abandonment of tenure, if this existed
    c. wrongfully constructively and actually terminate me with no due process by alleging abandonment of tenure in or around 2008, and
    d. withhold my vested retirement.
57. In November 2015, the University claimed I had abandoned tenure and yet it failed to provide any due process, as required by the CRRs in order to even allege I abandoned tenure.
58. Based on its allegations, it wrongfully terminated me in 2008, but engaged in a conspiracy to hide this allegation, if it existed until I sought to return to work
59. In 2008, General Counsel ordered staff to not terminate me or create a contract.
60. In 2008, if not before, Phil Hoskins of the General Counsel's office began investigating me and this seemed to continued up to and including 2016
61. The University did not process my vested retirement, vested as of 2008, if it had terminated me in any way.
62. The University also did not process me as terminated in any way and it has admitted to this since my employment status was "active" until November 2016.
63. Throughout the entirety of my leave and until I sought to return to work, I engaged with the University as a current employee and stayed in contact with Mr. Henson and he me to discuss my health status: I filed for long-term disability in August 2009 and distribution of my 403(b) due to disability. In 2012, I changed my address and saw my continued employment status. In 2014, I sought information on my vested retirement and was told that I was still employed.
64. Discovery in Lawsuit 3 shows that throughout 2008 thru October 2015, the University reported me as its employee for accreditation purposes, sought 5-year reviews for me, collected my mail, increased storage for my emails, and at no time stated I had abandoned tenure.

65. Despite numerous inquiries about me, Discovery in Lawsuit 3 shows that the University never actually communicated to me, never forwarded any of my mail, never involved me in any of the decisions about me, e.g., keep journals or mail, and never distributed vested retirement.
66. Throughout the entirety of my leave, the University budgeted my salary, paid my American Bar Association dues, listed me as an employee in the Association of American Law School's directory, and listed me as its employee in its databases, among many other University evidence, and at all times, including when Dessem was dean.
67. Discovery in Lawsuit 3 reveals that in 2014, General Counsel continued to not allow for any termination process against me and continued to review my case, though there were no cases at that time involving me.
68. Kenneth Dean sent 5-year reviews and whenever the then current dean Gary Meyers would ask about my situation, Dean would say was being handled or had been.
69. From librarians to tech support to human resources to retirement to benefits to the provosts office to the law school business manager, discovery in Lawsuit 3 reveals that the University personnel had numerous discussions about me but not once contacted me and not once claimed I had abandoned tenure until I sought to return to work.
70. Kenneth Dean after sending a second request for a 5-year review wrote to other University employees that he had an idea to fix my situation.
71. In 2014, Dean seemed pleased that I inquired about retirement since I referred to myself as a former employee when I was suffering confusion and in severe pain.
72. Rather than issuing my vested retirement if I was truly a former employee, no retirement was issued by order of Phil Hoskins in the General Counsel's office,, no termination was processed, and there was no reference to abandonment of tenure.
73. Thus the University did not issue my vested retirement from 2008 thru 2016 because I was still employed.
74. In 2014, I remained employed and the University did nothing to impact my employment or issue retirement if I was not employed until after I sought to return to work.
75. In August 2015, mere weeks before I filed my intent to return to work, Noel English stated to other University leaders, including Kenneth Dean,

> . . . I just talked to Alysha [Rychnovsky, long-term Manager of Business Administration since 2003] and she says (something like) Pam did not resign nor did she get fired so there was no basis for terminating when she left; and when Pam recently inquired about retirement benefits Phil Hoskins was involved but that did not result in an official termination either. Pam shows up in the census data with a salary although Alysha says she's not actually getting paid.
>
> . . . How do we fix this?

76. The fix was, upon information and belief, to claim I had abandoned tenure, using manufactured emails from Dessem, a manufactured suspension letter from Provost Foster, and having then Chancellor Loftin manufacture an allegation, as well as claim that Mr. Henson lacked the authority to grant me a disability accommodation.
77. None of this existed prior to my seeking to return to work in October 2015 and no record of any abandonment of tenure, suspension of pay or prior termination existed in my "official personnel file" or otherwise.
78. As English's email shows, weeks before I sought to return to work, the University's leadership admitted I had not resigned, had not been fired, and had not been terminated, but somehow that needed to be fixed. At no time did any of the individuals in the email contact me.
79. In September 2015, the University sent me a letter, "dear employee," and requested I make insurance elections that year even if I had not done so in the past.
80. At this same time, I was very busy with physical therapy for the severe pain, taking a class to hone my research skills, and otherwise preparing to return to work. I had a private investigator verify employment, among other activities, including obtaining my personnel file.
81. Prior to and after seeking to return to work, I also obtained a wealth of electronically stored information (ESI). As the Second Amended complaint in **Lawsuit 3** shows, I was listed as a current employee and issued pay stubs, had an annual salary budgeted, received annual insurance notices, was listed in the faculty database, received my American Bar Association (ABA) dues paid for, was listed as law faculty in the Association of American Law School's (AALS) directory, was listed in the University's current employee database, was listed as an expert in the University's expert database, was required to select insurance benefits in 2015, was billed for these benefits in 2016, was identified as a current employee to the IRS throughout 2015 and most of 2016, and was listed as a University employee when I sought to verify salary and employment with the University's employee salary and employment verification service, among many other University business records, business actions, business behaviors, or employee contacts.
82. As Lawsuit 3 shows, my "official personnel file" also showed my continued employment, reflected what English had admitted to, and did not show any of the manufactured allegations that University and Loftin would raise in November 2015.
83. As Lawsuit 3 shows, In October 2015, I filed an intent to return to work, notifying the University of my disability and need for accommodations.
84. Initially, the ADA Coordinator was enthusiastic about beginning the interactive process and scheduled a meeting. As discovery in Lawsuit 3 shows, once she interacted with Noel English and others, the ADA Coordinator cancelled the meeting and refused to respond to requests to reschedule.
85. In 2019, via affidavit, the current ADA Coordinator also claimed that since she lacked authority to grant a leave in 2019, Mr. Henson must have also lacked authority to grant a leave in 2007, ignoring the great differences in their qualifications and credibility.
86. Shortly after the ADA Coordinator cancelled the interactive process, and failed to respond to repeated communications, I filed the MCHR/EEOC initial charge in Lawsuit 3.

87. In response, then Chancellor, R. Bowen Loftin wrote a letter in November 2015, manufacturing the lie that I had abandoned tenure. Discovery in Lawsuit 3 shows that nothing in his letter was true and he also ignored all the existing ESI showing my continuously employment. The letter was clearly inaccurate and the then Chancellor misinformed. Yet, my attempts to communicate to temporary leaders on campus were to no avail.
88. Discovery shows that University personnel continued to discuss me. As discovery shows in Lawsuit 3, in February 2016, several staff members stated that General Counsel ordered no termination and did so since 2008.
89. In July 2016, Noel English wrote the MCHR claiming that I was not employed despite admitting the opposite almost a year previously.
90. Because I sought to return to work, as a person with a disability, seeking disability accommodations, the defendants began to conspire to terminate my tenured employment and block distribution of my vested retirement once I was terminated.
91. Discovery in Lawsuit 3 shows, shows the University's "fixed" the situation of my seeking to return to work as a person with a disability at Kenneth Dean's behest and upon information and belief, General Counsel's permission after the 2008 prohibition to not terminate by
    a. Spoliating, initially in or around November 2016, by changing my employment status to "terminated" without due process;
    b. Spoliation, again in or around November 2016, by blocking my retirement for almost two (2) years; and
    c. Spoliation, again in or around November 2016, if not before, by blocking all my e-access I had previously or should have as a former, retired employee.
92. Kenneth Dean used the manufactured and false Loftin November 2015 letter to justify a PeopleSoft termination, selecting "involuntarily terminated" in the Personnel Action Form.
93. No PAF existed to terminate me prior to Dean's 2016 PAF.
94. I was not terminated prior to this 2016 PAF.
95. I was terminated after this 2016 PAF.
96. When it terminated me the University's documentation showed and thus the University admitted that I had been continuously employed from July 1, 2001, until November 4, 2016, the date it terminated me.
97. The University confirmed its involuntary termination of my tenured employment by December 2016 and then placed the lies in my official personnel file.
98. I did not have any form of due process prior to this termination, not even notice it would occur.
99. When it processed its PAF, the University also admitted that I had been continuously employed when it involuntarily terminated me.
100. Yet, in a letter dated March 8, 2016, the University confirmed that I was on an "approved leave of absence." Eight (8) months after receiving notice that the University knew I was on an "approved leave of absence," I was terminated.
101. Almost exactly one (1) year after I filed a complaint for disability discrimination with the MCHR and the EEOC in November 2015, the University's employees conspired to and did actually terminate my employment in November 2016, without any form of due process.

102. Seven (7) years after failing to provide notice of any allegation of abandonment of tenure in 2008, the University sent a clearly false letter in November 2015.
103. Eight (8) years after failing to process any form of termination, in November 2016, the University process a termination from 2008.
104. Once I sought to return to work in October 2015 and filed complaints with the Missouri Commission on Human Rights (MCHR) and the Equal Employment Opportunity Commission (EEOC), the University, as a state entity, and its individual soon-to-be defendant employees continued to retaliate against me by conspiring to terminate my tenured position, constructively terminating my tenured position, actually terminating my tenured position, blocking distribution of my property interest in my vested retirement for eighteen (18) months without recompense, and violating my vested property interest in retirement and my property and liberty interest in my tenured position.
105. I had not thought of the older lawsuits (Lawsuits 1 and 2) but during my October 2018 deposition and again in its Motion for Summary Judgment, the University brought up these older lawsuits repeatedly.
106. I did not learn that the University claimed my entire leave was illegitimate until December 2018.
107. I did not realize the University continued to have a retaliatory mindset against me until October 2018, at my deposition when the University focused on Lawsuit 1 and 2. I have filed three (3) Lawsuits against the University. Despite its Collected Rules and Regulations (CRRs) containing anti-retaliation and anti-discriminatory provisions, I have been continuously retaliated against and discriminated against as a person with a disability, particularly being denied any form of accommodations.
108. I did not learn Dessem had sent unlawful demands via email until October 2018.
109. I did not learn that the University's entire abandonment of tenure allegation was based on Dessem's emails from 2007-2009 until October 2015.
110. I did not learn of this allegation of abandonment of tenure or a prior termination at some undermined time in 2008, until I sought to return to work in October 2015.
111. I did not discovery I had been terminated until I received COBRA notices in December 2016.
112. I did not discover that the University provided me no form of due process for its wrongful termination until 2016.
113. I did not discover that the University used spoliation to terminate me to circumvent contractual, constitutional, and good faith due process protections until June 2018.
114. I did not discovery that the University did not provide me any form of notice as required by contractual, constitutional, and good faith due process protections at any time, including in 2008, until June 2018.
115. I did not discover that the University withheld my vested retirement multiple times, and yet claimed I was terminated, until June 2018.
116. I did not discover that the University was continuing to escalate against me because of my prior Lawsuits until the deposition in October 2018.
117. The University's continuous and escalating retaliation has resulted in my termination and has caused me excessive stress, anxiety, and depression. I have suffered major exacerbations of my disability since 2008, resulting in extreme health crises including a 7-hour surgery.

118. Since 2015, I have suffered excessive stress, anxiety and depression, as well as exacerbation of my disability, which required a complete overhaul of my working medical treatments.
119. The University's retaliatory actions will prevent me from taking advantage of my tenure and rights as an employee of the University, has left me few employment opportunities and no opportunities to have a professional conversation with the University, and has denied me the full opportunities for employment and retirement.
120. I did not receive any formal notice from the University prior to or after any actions of retaliation, I was not given an opportunity to correct whatever the cause was as required by the CRR, I was not given any due process or procedures as a tenured faculty member as required by the CRR, I was not given any form of notice before any adverse actions as the University and its employees refused to talk to me, though they did quite a bit of talking about me.
121. I did not receive a letter or a call from the University prior to or any termination to notify me of any due process, I did not receive a hearing alleging violations of any University policy prior to any termination, and I did not receive any investigation or due process to assess whether there was a reason to terminate me.
122. I did not receive any communications from the University or any face-to-face meetings with the University prior to being terminated.
123. Despite my best efforts as a person with a disability, the retaliation never stops.
124. Prior to being retaliated against, up to and including termination and having my retirement delayed almost 2 years, I did not receive any protections afford a tenured University law faculty member according to the University's own policies and procedures for dismissal of tenured faculty detailed in the CRR.
125. Because the University terminated my employment on or around November 4, 2016, for the first time I received notice of COBRA benefits dated November 2016, stating there was a termination.
126. In this same letter November 4, 2016 COBRA letter, I was informed to no longer sign in as a current employee on the University's Human Resources website, but to sign in as a "former employee" as of November 4, 2016 and to give it 30 days.
127. The COBRA Continuation Coverage Election Form for the University, included with the letter, also noted that I experienced event "Termination" on event date "November 4, 2016."
128. On or around December 17, 2016, for the first time I received a letter from the University Retirement Benefits dated December 7, 2016. This letter stated:

> "Our records indicate that you may be eligible for a non-vested or vested benefit under the University of Missouri total rewards myRetirement program. The retirement office will prepare a packet of information about this benefit, which will include benefit election forms. Please allow 4-6 months after termination before you receive your packet of information in the mail."

129. This December 2016 notice is the first and only retirement information I have ever received from the University, despite the University's claim I allegedly abandoned tenure and was terminated in or around 2008.
130. I did not give the University permission to delay distribution of my vested retirement benefits.
131. I never received the packet the above claims will be sent.
132. All post-termination documents, including Verification by the University's employment verification service, The Work, documents the University sent to the Internal Revenue Service (IRS), and all other post-termination documents show a termination and only on November 4, 2016.
133. In 2019, when I checked The Work again, it showed that the University listed me as an employee retiree as of November 5, 2016, but did not pay any form of distribution until July 30, 2018.
134. Upon information and believe, after the 2016 termination, the University and its employees, namely attorneys Joel Poole, Farnsworth, and Emily Little continued to retaliate against me as it blocked all information on and distribution of my retirement, through additional spoliation.
135. I received no information on my retirement in 2016, 2017, or the six months in 2018. I finally called to obtain information about the distribution of my retirement since the University had terminated me in November 2016.
136. A University Human Resources representative I talked to on the phone on June 13, 2018, when I inquired about my retirement information, stated that nothing had been done, not even the first phase letter for vesting.
137. She expressed surprise and shock, stating that all processing had been "blocked."
138. She stated she would open a red ticket and someone from HR or the retirement office would get back to me once the blockage was investigated.
139. No one from human resources or the retirement office contacted me.
140. Rather, on June 18, 2018, I received an email from attorneys representing the Defendant in Lawsuit 3, i.e., Emily Little and Joel Poole, informing me that I had made in inquiry about my retirement and giving me a specific contact retirement specialist, Laura Denzel, who was working with them on my retirement.
141. I was shocked that upon information and belief, they had blocked all information about my retirement from me and were monitoring any requests I would make about my retirement, because of this litigation for well over a year.
142. Given that the University's attorneys should have had nothing to do with my retirement or selection of beneficiaries or type of distribution, I replied to Ms. Denzel that I would not be copying Defendant Little or Defendant Poole on any subsequent correspondence.
143. Upon information and belief, Ms. Denzel still forwarded my private retirement selections, as well as social security and birth information of my beneficiaries, to Defendants Poole and Little.
144. I did not voluntarily retire. I was involuntarily terminated.
145. As I sought a monthly distribution, the Defendant denied me the opportunity to obtain approximately $600 a month since December 2016, when I turned 55.
146. Once I was finally in contact with a retirement specialist and I received the retirement information, in setting forth the service calculations, Ms. Denzel noted:

13 of 20

Case 2:19-cv-04050-BCW Document 10 Filed 03/11/19 Page 13 of 20

"9/1/08-11/4/16 – not actively working – no service credit," which is another University admission that I was employed, on leave, and not getting paid.
147. Further, in setting forth the salary calculations, which uses the past 5 highest salaries, if I had been allowed to return to work in June 2016, as intended, I could have obtained $7,500 for each of the summers of 2016, 2017 and 2018 if I had been allowed to work, which would have increased my retirement distribution.
148. Moreover, in setting forth the salary calculations, which uses the past 5 highest salaries, if I had been allowed to return to work for academic years 2016-2017, 2017-2018, and 2018-2019, my last 3 highest salaries (ignoring the potential for raises and promotions) would have used my budgeted and reported salary of $96,041, thereby increasing my overall retirement distributions.
149. I did not seek or deserve termination. But once I was terminated, Defendant should have treated me like very other employee regarding access to myHR, especially for retirement information. It did not. In its December 2016 retirement notice, the Defendant stated that this Plaintiff could sign on to myHR to obtain information about estimated retirement calculations, to change address, and to see other information available on myHR.
150. Yet, despite this Plaintiff making several attempts in 2017 and early 2018, I could never sign on after the MCHR investigations became. Discovery in Lawsuit 3, shows that the University intentionally blocked my e-access.
151. Despite multiple calls to IT, as recommended in the December 2016 letter, I could not change my password or sign on. The IT representative I talked to on the phone on June 13, 2018, stated my access had been blocked and he would open a ticket with accounts management and someone from IT would get back to me once the blockage was investigated.
152. When I called back weeks later, after unsuccessfully trying to sign on again, I was told that accounts management had referred my account to security but that it was still blocked and I could not access it.
153. As of March 2019, I have yet to hear back from anyone at the University regarding how to sign on to myHR and continue to be blocked. MyHR is where I obtained a great deal of the above prior information and business records showing my continued University employment from July 1, 2001 to November 2016.
154. In numerous ways since I complained about Dessem's racial retention policy in 2006, the University has continuously retaliated against me as shown above from constructively discharging me by failing to provide accommodations to actually terminating only as I sought to return to work and once it terminated me, blocking distribution of my vested retirement

### S. HARM AND DAMAGE

155. By being not allowed to return to work, I have suffered stress, anxiety, depression, and an exacerbation of disability symptoms, causes severe relapses since 2008.
156. I am shocked by the myriad of actions the University has taken to retaliate against me.
157. I suffer anxiety and depression because of its actions, as well as multiple exacerbations of my disability.

158. I grieve over the impact the University's behavior had on my health since 2006 and certainly since I sought to return to work in 2015.
159. By not being allowed to return to work, I was denied faculty benefits, including budgeted salary, retirement increases, negotiated faculty allowance, and other University benefits on or before June 2016.
160. As discovery in Lawsuit 3 shows, by communicating to numerous personnel that I allegedly abandoned tenure in or around 2008 and should not be communicated to, the University has damaged my University reputation, which has caused anxiety and depression and will make it difficult for me to return to the University working with ADA personnel, law school personnel, University leadership and many others.
161. By implying that I should not have relied on or trusted its ADA Coordinator, Lee Henson, in 2007 and 2008, the University has caused me severe stress, anxiety and depression since it failed to inform me of this prior to 2019.
162. By claiming I abandoned tenure rather than being on an "approved leave of absence," the defendants defamed my professionalism and impugned my reputation, causing me severe anxiety, stress and depression.
163. By claiming I was terminated in or around 2008 because I abandoned tenure, rather then being on an "approved leave of absence," the defendants denied me the ability to return to work as a person with a disability and negatively impacts my ability for future employment.
164. By stripping me of tenure and employment without any form of due process, the defendants violated my right to return to work and obtain the economic benefits of tenure without threat, including my annually budgeted salary, faculty resources and University benefits.
165. By stripping me of tenure and employment without any form of due process, the defendants violated my contract for tenured employment, without good faith.
166. By acting in bad faith, turning an admitted "approved disability leave" into an allegation of abandoning tenure, without any received notice, University has caused me significant distress, anxiety, depression, and an exacerbation of my disability.
167. It will be difficult, if not impossible, for me to find any new position or even visit in legal academia given the University's allegations of my abandoning tenure despite being on an "approved leave of absence."
168. The University's allegations curtail all my future possibilities and have destroyed my career and my desire to return to work as a person with a disability.
169. The University failed for over eight (8) years to inform me of this allegation of abandonment of tenure and termination until I sought to return to work in 2015 as a person with a disability seeking disability accommodations.
170. The stated reasons for the allegations of abandonment of tenure were not the true reasons, but instead were pretext to hide the defendants' continuous retaliatory animus, continuous breach of good faith, and continuous violations of all due process rights, among other causes of actions.
171. For years, I have worked tirelessly to learn to live with and manage my disability so I could return to work as a person with a disability.
172. The defendants have denied me the opportunity to work as a person with a disability because of continuous retaliation.

173. Because of the defendants' actions, I suffer stress, uncertainty, depression, anxiety and fear for my future. I grieve over the health I have lost because of the University's actions since 2006, particularly since 2015 when I had achieved some recovery.
174. Being terminated impacts my employability overall and especially within academia, given that for a tenured faculty member to be terminated cause is necessarily implied.
175. Moreover, I was entitled to retirement distribution by my 55th birthday (December 2016)) and would have received this but for the University's retaliatory blocking my retirement.

## CAUSES OF ACTION

176. The foregoing paragraphs are re-alleged and incorporated by reference herein.
177. The University has continuously retaliated against me since 2006, conspiring to breach and then escalating to breaching my employment contracting for tenure, after constructively discharging me repeatedly by failing to provide disability accommodations and then actually wrongfully discharging me in 2016, in violation of
    a. The Americans with Disabilities Act, as amended,
    b. The Rehabilitation Act of 1973, as amended,
    c. The Missouri Human Rights Act as amended,
    d. The implied covenant of good faith and fair dealing that is part of my contractual protections,
    e. The contractual due process protection in its CRRs'
    f. The anti-discrimination ad anti-retaliation provisions in its CRRs,
    g. The constitutional (substantive and procedural, state and federal) due process protections given my contract for tenured employment,
    h. The constitutional (substantive and procedural, state and federal) due process protections given my vested property right in retirement;
    i. Any and all of the above on prohibitions regarding conspiring to breach my employment contract for tenure, my property right in tenure, and my contract right to and property interest in my vested retirement.

178. The foregoing paragraphs are re-alleged and incorporated by reference herein, all of the above causes of actions exist because
    a. The University began retaliating against me when I complained about Dessem racial retention policy that excluded most, if not all, people of color, and he threatened to terminate my tenure.
    b. Each complaint, as shown above, is followed by more retaliation as the Defendants ignore state and federal law, the covenant of good faith and fair dealing, the University's CRRs for dismissals, anti-discrimination, and anti-retaliation.
    c. The University has continuously retaliated against me by discriminating against me by failing to provide any form of accommodations prior to January 2008.

d.  The University has continuously retaliated against me by discriminating against me by failing to provide any form of accommodations after January 2008.
e.  The University has continuously retaliated against me by discriminating against me by failing to provide any form of accommodations after October 2015.
f.  The University has continuously retaliated against me by claiming I abandoned tenure without pursuing any form of constitutional or contractual due process since 2008, in the interim, in 2015, or 2016.
g.  The University has continuously retaliated against me by breaching the covenant of good faith and fair dealing since 2008, in the interim, in 2015, or 2016..
h.  I was an employed, tenured Associate Professor of Law, with a disability, when I sought to return to work with the University in October 2015.
i.  The University, Defendant Dessem, Defendant Loftin, Defendant Dean have continuously retaliated against me by discriminated against whenever I have sought accommodations in order to constructively discharge me
j.  I am a person with an actual disability and was a person with a disability when I applied to return to work with the University.
k.  I am a person with a record of disability and such a record of disability when I applied to return to work with the University.
l.  I was and am qualified to perform all essential functions of my position as an Associate Professor of Law with the University, with accommodations.
m.  In February 2006, I sought an interactive process for disability accommodations and was not provided any to work, with a constructive discharge for wrongful termination being avoided because Mr. Henson provided a disability leave as an accommodation.
n.  This request for accommodations was ongoing in 2008-2009 and since, when Dessem violated the ADA, creating constructive discharge by
    i. Sending emails, knowing I had vision issues and was not online
    ii. Demanding more medical documentation
    iii. Demanding "medically superior" assessment, in violation of the ADA
    iv. Failing to provide extensions or elimination of nonessential job functions
o.  This request for accommodations was ongoing in August 2008 and since, when Defendant Foster violated the ADA, creating constructive discharge by
    i. Failing to contact me at all prior to any form of adverse action;
    ii. Failing to provide any time to correct any allegations;
    iii. Relying on Dessem's emails, knowing I had vision issues and was not online
    iv. Demanding more medical documentation
    v. Demanding "medically superior" assessment, in violation of the ADA
    vi. Failing to provide extensions or elimination of nonessential job functions
p.  In October 2015, I sought an interactive process and disability accommodations from the University. As of October 2015, I was

        constructively discharged due to wrongful termination because I was denied an interactive process because the University cancelled the interactive process meeting and then failed to answer my repeated correspondence seeking this meeting to obtain accommodations.

    q.    As of November 2016, I was wrongfully termination through the use of the University's PeopleSoft software with no form of due process.

    r.    I continued to be denied an interactive process by the University even as it terminated me and the University denied me the right to return to work as a person with a disability.

179. The University did not claim Mr. Henson lacked authority to provide disability accommodations until 2019, it having failed to do so in the twelve (12) years prior.

180. The Defendant did not claim I had allegedly abandoned tenure until I sought to return to work in 2015 as a faculty member with a disability, seeking disability accommodations to return to work as a tenured faculty member with a disability, it having failed to do so for seven (7) years..

181. The University did not attack my tenure and employment until I complained about a racial retention policy and filed the first complaint with the MCHR/EEOC in 2006.

182. Since 2006, the University has engaged in constructive discharge, wrongful discharge, and a myriad of terminations in violation of all contractual and constitutional due process.

183. Its retaliation does not stop and even after it terminated me secretly in 2016 by using its software, in violation of due process, it continued to retaliate against me by delaying the distribution of my vested retirement by almost two (2) years.

184. Further, if it had terminated me in 2008, it delayed the distribution of my vested retirement benefits by ten (10) years.

185. I was damaged by the University because I was denied my tenured employment, a salary of at least $96,041 a year, faculty account of $9,000 per year, and other benefits and privileges as a tenured Associate Professor of Law, as well as to be free of discrimination and continuous retaliations, which have caused or contributed to my disability and caused repeated exacerbations.

### IX. PRAYER FOR RELIEF

As relief from the allegations above continuous and escalating retaliation in violation of federal and state disability retaliation statutes, federal and state constitutional due process law, and conspiracy to breach , and other causes of action, as stated above, Plaintiff prays that the Court grant the Plaintiff relief to make her whole, with the following relief in compliance with the ADA, the Rehabilitation Act, 42 USC sec 1983, and Missouri state statutory and contract-based and common law:

    ☑    For violations of the ADAAA, RAAA, and MHRA, Plaintiff seeks injunctive relief to have all of the above described retaliatory behavior stop, including being immediately reinstated to her position; Defendants be directed to stop

> trying to and/or removing Plaintiff's tenure, generally and particularly without due process; Defendants be directed to stop violating the covenant of good faith and fair dealing by trying to and/or removing Plaintiff's tenure, generally and particularly without due process.
> ☑ Monetary damages: back pay as of June 2016, the month in which the Plaintiff would have returned to work but for the Defendant's retaliatory actions until the June 2019 trial date; front pay until retirement age; back pay of monthly retirement from December 2016 until July 31, 2018; University benefits including but not limited to life insurance, health insurance, accidental death insurance and long-term disability benefits; restoration of all other employee and faculty benefits including but not limited to a faculty account, starting January 2016, American Bar Association annual dues and State bar dues or the monetary equivalent.
> ☑ As additional relief to make Plaintiff whole, Plaintiff seeks monetary remedies for:
>   ☑ Pain and suffering, emotional distress, and contractual damages for retaliation including multiple terminations without due process and while Plaintiff was on an admitted approved leave of absence.
>   ☑ Removal of all adverse material from any and all Plaintiff's personnel files, be it in electronic or otherwise and correction of all records to show Plaintiff was on an "approved" disability leave as an accommodation and had not abandoned tenure or been terminated.
>   ☑ Costs and reasonable attorneys' fees.
>   ☑ Statutory damages allowed under the any of the statutes cited above.
>   ☑ Damages to fulfill the employment contract Plaintiff has with the University.
>   ☑ Punitive damages, as deemed just for the Defendant's shocking, abusive, predatory, and retaliatory behavior against a person with a disability, including spoliation twice.
>   ☑ Other damages and further relief as deemed just.

## X. CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: **March 11, 2019**

Signature of Plaintiff: *Pamela J. Smith*

Printed Name of Plaintiff: **Pamela J. Smith**
Pamela J. Smith, pro se
6620 S. Maple Meadows Drive
Columbia, MO 65203
573/875-4076 (phone and fax)
Pamela_J_Smith@yahoo.com